## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUMMITBRIDGE WEALTH MANAGEMENT LLC and ARNA PREMIER PROPERTY SOLUTIONS, | |
| Plaintiff, | **Case No. 26-CV-141 (JMA) (ST)** |
| - against - | |
| LIGHTHOUSE ESTATES LLC, CEEKOU LLC, STARPOINT HOLDINGS LLC, AVS ESTATES LLC, BLUESTAR CAPITAL LLC, RED DOOR LEGACY LLC, TAIHE ESTATES LLC, REDWOODS REAL ESTATE LLC, HIDDEN GEMS VENTURES, HIDDEN GEMS TC SERVICES LLC, MARCIA DONALDSON, VAN LAURENCE BARKER, ARIEL MERMELSHTAYN BARKER, SIYUAN ZHENG, JOSHUA JAMES KENNEDY, UNIVERSITY TITLE COMPANY, MEMBERS TITLE, FIRST CLASS TITLE AGENCY, TRUE TITLE ESCROW AGENT, PERPETUAL TITLE OH, LEGACY TITLE AND ESCROW, and ELITE TITLE, | **FIRST AMENDED VERIFIED COMPLAINT** **Jury Trial Demanded** |
| Defendants. | |

1.      Plaintiff, Summitbridge Wealth Management LLC and Arna Premier Property Solutions, ("Plaintiffs"), by and through their undersigned counsel of record, TA Legal Group PLLC hereby file this First Amended Verified Complaint ("Complaint") against Defendants Lighthouse Estates LLC, Ceekou LLC, Starpoint Holdings LLC, AVS Estates LLC, Bluestar Capital LLC, Red Door Legacy LLC, Taihe Estates LLC, Redwoods Real Estate LLC, Van Laurence Barker, Ariel Mermelshtayn Barker, Siyuan Zheng, Joshua James Kennedy (collectively, the "Lighthouse Defendants"), Hidden Gems Ventures, Hidden Gems TC Services LLC, Marcia

Donaldson (collectively, "Transaction Coordinator Defendants"), University Title Company, Members Title, First Class Title Agency, True Title Escrow Agent, Perpetual Title OH, Legacy Title and Escrow, and Elite Title (collectively, "Title Company Defendants"), and allege as follows:

2.      This action arises from a coordinated scheme to fraudulently induce Plaintiffs and other private money lenders to fund real estate transactions through material misrepresentations, concealment, and the misuse of investor funds in a manner consistent with a Ponzi-style scheme.

3.      The Lighthouse Defendants, led by Defendant Van Laurence Barker, solicited funds purportedly for specific real estate acquisitions and renovations but instead diverted incoming lender funds to repay other investors, cover operating shortfalls, and conceal a failing business model—causing Plaintiffs substantial losses.

4.      There is an imminent risk that assets of Plaintiffs—totaling over $1.1 million—will be dissipated or fraudulently conveyed by Defendants, absent immediate judicial action. Plaintiffs have sought a TRO, which is reincorporated and reasserted herein, and await determination of that application.

### JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as the claims arise under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. This Court has jurisdiction over the civil RICO claims pursuant to 18 U.S.C. § 1964(c). The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367, as they are so related to the federal claims that they form part of the same case or controversy.

9.      This Court has personal jurisdiction over Defendants Hidden Gems Ventures LLC, Hidden Gems TC Services LLC, and Marcia Donaldson pursuant to New York's long-arm statute, N.Y. C.P.L.R. § 302, and principles of constitutional due process. These defendants purposefully availed themselves of the privilege of conducting activities within New York by, among other things:

   a.   Transacting business within the state by systematically and repeatedly soliciting New York-based Plaintiffs through targeted social media campaigns, emails, and telephone calls; entering into agreements with New York residents; and directing and controlling real estate transactions funded by Plaintiffs from New York.

   b.   Committing tortious acts without the state that caused foreseeable injury to person and property within the state. Specifically, these defendants made fraudulent misrepresentations and omissions from outside New York that were intended to, and did, induce reliance by Plaintiffs in New York, causing direct financial loss in this District. These defendants regularly solicit business and derive substantial revenue from interstate commerce and should have reasonably expected their acts to have consequences in New York.

10.     This Court has personal jurisdiction over Defendant Bluestar Capital LLC on at least three independent bases:

   a.   Pursuant to N.Y. C.P.L.R. § 302(a)(3), for committing tortious acts without the state causing injury within the state. Upon information and belief, Bluestar wired funds to the enterprise knowing or recklessly disregarding that the capital infusion was necessary to sustain a fraudulent scheme that was actively targeting and

harming New York-based Plaintiffs, thereby causing foreseeable financial injury in New York.

b. Pursuant to the nationwide service of process provision of the RICO statute, 18 U.S.C. § 1965(b), which provides for jurisdiction over a defendant in any district court if it is shown that the ends of justice so require.

c. Under a theory of co-conspirator jurisdiction, whereby overt acts committed in New York by Bluestar's co-conspirators in furtherance of the fraudulent enterprise— including the transmission of fraudulent communications into this District—are attributable to Bluestar for jurisdictional purposes.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Specifically, Defendants directed fraudulent communications into this District, entered into contracts with Plaintiffs located in this District, and caused direct and substantial financial injury to Plaintiffs within this District.

## **PLAINTIFFS**

12.     Plaintiff Summitbridge Wealth Management LLC is a New York limited liability company with its principal place of business at 338 Jericho Turnpike, Suite 106, Syosset, NY 11791.

13.     Plaintiff Arna Premier Property Solutions is a New York entity with its principal place of business at 329 S. Oyster Bay Road, Suite 202, Plainview, NY 11803.

14.     Plaintiffs both acted as private money lenders, conveying substantial funds to Defendants in reliance on their representations, and are at immediate risk of irreparable harm and misappropriation of those funds absent prompt judicial action.

## **DEFENDANTS**

15.    Defendant Lighthouse Estates LLC ("Lighthouse") is a limited liability company that served as the primaryl borrower and/or titleholder for numerous subject properties financed with Plaintiffs' funds. Lighthouse operated as a central hub within the fraudulent enterprise and was controlled and managed by individual Defendants Van Laurence Barker, Ariel Mermelshtayn Barker, and Joshua James Kennedy.

16.    Defendant Ceekou LLC ("Ceekou") is a limited liability company used to originate, route, and control transactions within the scheme. Ceekou is owned and/or controlled by Defendants Siyuan Zheng and Lighthouse Estates LLC and functioned as an intermediary entity for property acquisitions and fund transfers.

17.    Defendant Starpoint Holdings LLC ("Starpoint") is a limited liability company controlled by Defendants Van Laurence Barker and Joshua James Kennedy, with ownership interests held through Ceekou LLC. Starpoint served as an operational and financial vehicle within the enterprise, including the pooling and redeployment of investor capital.

18.    Defendant AVS Estates LLC ("AVS") is a limited liability company controlled by Defendants Van Laurence Barker, Ariel Mermelshtayn Barker, and Siyuan Zheng. AVS held title to and/or borrowed against properties funded by Plaintiffs and was used to conceal the commingling and misuse of lender funds.

19.    Defendant Bluestar Capital LLC ("Bluestar") is a limited liability company used as a reserve and capital-backing entity for the enterprise. Bluestar is owned in substantial part by Brian Barker and Starpoint Holdings LLC. In August–September 2025, Brian Barker, acting through Bluestar, wired a substantial sum, believed to be several hundred thousand to over one million dollars, into Starpoint and/or Lighthouse accounts. Bluestar made this capital infusion with

actual knowledge of, or in reckless disregard for, the fact that the Lighthouse enterprise was insolvent and unable to meet its obligations to existing lenders. Upon information and belief, Bluestar received distributions derived from defrauded PML capital through fabricated invoices created by the enterprise and submitted to title companies, allowing closing proceeds from PML-funded transactions to be routed directly to Bluestar under fictitious line items. Further, upon information and belief, Bluestar engaged in a pattern of predatory, short-term lending to the enterprise, such as advancing $30,000 and demanding repayment of $35,000 within one week, an arrangement that gave it continuous, real-time visibility into the enterprise's dire cash position.

20.     Defendant Red Door Legacy LLC ("Red Door") is a limited liability company controlled by Defendants Ariel Mermelshtayn Barker, Van Laurence Barker, and Joshua James Kennedy. Red Door held interests in properties financed with Plaintiffs' funds and operated as an additional shell entity within the enterprise structure.

21.     Defendant Taihe Estates LLC ("Taihe") is a limited liability company that served as a borrower and/or titleholder for certain transactions funded by Plaintiffs. Taihe was used to further disperse lender funds and obscure true ownership and control of the financed properties.

22.     Defendant Redwoods Real Estate LLC ("Redwoods") is a limited liability company that held title to and borrowed against properties funded by Plaintiffs, including transactions involving title and escrow Defendants named herein. Redwoods functioned as part of the layered entity structure used to misrepresent lien status and property ownership.

23.     Defendant Hidden Gems Ventures LLC ("HGV") is a Florida limited liability company with its principal place of business at 7901 4th Street North, Suite 300, St. Petersburg, Florida 33702. At all relevant times, HGV's sole owner was Defendant Marcia Donaldson. HGV operated as the primary marketing, solicitation, and recruitment arm of the enterprise, inducing

Plaintiffs to invest by making false and misleading representations through targeted social media campaigns, national real estate investment communities, and direct email outreach. HGV and HG TC shared the same principal place of business, the same toll-free number, and the same website domain family, and operated as a single integrated enterprise under Donaldson's common control.

24.     Defendant Hidden Gems TC Services LLC ("HG TC") is a Florida limited liability company with its principal place of business at 7901 4th Street North, Suite 300, St. Petersburg, Florida 33702, identical to HGV. At all relevant times, HG TC's sole owner was Defendant Marcia Donaldson. While purporting to provide "transaction coordination services," HG TC in practice assumed total control over the closing process, inserting itself as the exclusive communication gatekeeper between Plaintiffs and title companies. HG TC instructed title companies that all communications must flow through it and affirmatively represented that it would obtain and convey lender approval for all disbursements, which was a condition precedent for funding. HG TC then approved disbursements, including undisclosed fees to itself, HGV, and other third parties, including, i.e. Salty Fox Capital LLC, without Plaintiffs' knowledge or authorization.

25.     Defendant Marcia Donaldson is an individual residing at 85030 Majestic Walk Boulevard, Fernandina Beach, Florida 32034. Donaldson is the sole owner, manager, and principal of both HGV and HG TC. She personally solicited Plaintiffs as private money lenders, made personal guarantees to Plaintiffs (e.g., "I will pay you myself if this goes sideways"), and enforced her role as the exclusive liaison between Plaintiffs and borrowers. In September 2025, Donaldson fabricated and transmitted documents via interstate wire to conceal the misappropriation of Plaintiff SummitBridge's funds. On multiple transactions, Donaldson personally prepared the mortgage instruments intended to secure Plaintiffs' investments without disclosing that she, not a licensed attorney, was drafting them.

26.     Defendant Van Laurence Barker ("V. Barker") is an individual who exercised ownership and operational control over Lighthouse Estates LLC, Starpoint Holdings LLC, AVS Estates LLC, and related entities. Barker acted as a principal of the enterprise and directed the acquisition, financing, and disposition of properties funded with Plaintiffs' money.

27.     Defendant Ariel Mermelshtayn Barker ("A. Barker") is an individual who held ownership interests and control positions in Lighthouse Estates LLC, AVS Estates LLC, and Red Door Legacy LLC, and who participated in enterprise decision-making related to property acquisitions and lender communications.

28.     Defendant Siyuan Zheng ("Zheng") is an individual who owned and controlled Ceekou LLC and AVS Estates LLC and participated in the management and execution of transactions funded by Plaintiffs, including the routing and commingling of investor funds.

29.     Defendant Joshua James Kennedy ("Kennedy") is an individual who exercised ownership and control over Lighthouse Estates LLC, Starpoint Holdings LLC, and Red Door Legacy LLC and participated in the enterprise's acquisition, financing, and misrepresentation of subject properties.

30.     Defendants University Title Company, Members Title, First Class Title Agency, True Title Escrow Agent, Perpetual Title OH, Legacy Title and Escrow, and Elite Title (collectively, the "Title Defendants") are title and escrow companies that served as closing agents for one or more transactions at issue and, upon information and belief, facilitated the improper disbursement of lender funds, failed to ensure recording of liens, and/or processed transactions containing material irregularities under the direction of the other Defendants.

## ADDITIONAL ALLEGATIONS AS TO TRANSACTION COORDINATOR DEFENDANTS

**Defendant HGV**

40.    Defendant Hidden Gems Ventures LLC ("HGV") was the primary marketing and solicitation vehicle for the Lighthouse Defendants' Enterprise. Controlled entirely by Defendant Marcia Donaldson, HGV acted to induce Plaintiffs and other private money lenders nationwide to invest in the fraudulent scheme through a coordinated campaign of false and grossly negligent misrepresentations that breached fiduciary duties to Plaintiffs.

41.    On December 10, 2024, HGV, through its agent and an associate of Donaldson, published a post on Facebook announcing a partnership with Starpoint Holdings. This post, which identified Donaldson by name, was targeted at prospective private money lenders and falsely represented that: (a) Starpoint had a "reputation for renovating homes and repaying lenders ahead of schedule"; (b) lenders would receive "1st liens"; and (c) loans would have "6-month terms with 15–20% returns."

42.    Each of these representations was false at the time Plaintiffs invested and contracted with HGV.

43.    On April 8, 2025, HGV, through Donaldson, published another solicitation in a national private money lender Facebook group under the HGV brand. This post was viewed by Plaintiffs and made the following specific, false representations to induce investment: (a) "100+ projects completed"; (b) "60 refinances in one year"; (c) "Lenders paid back early—consistently"; (d) investments were secured by "1st Position Liens"; and (e) "up to 90% of our PMLs come back to fund again."

44.    At the time HGV made these representations, it knew or recklessly disregarded that they were false. The Enterprise's refinancing strategy had already failed, incoming PML funds were being recycled to service prior obligations, and lenders were not being repaid early or consistently.

45.    HGV operated as a single, integrated enterprise with HG TC under the common control of Donaldson. They shared the same principal place of business, the same toll-free telephone number (866-953-GEMS), and the same website domain family. Donaldson operated the two entities interchangeably, using HGV to solicit the investors and HG TC to control the subsequent transactions.

46.    HGV also served as a primary vehicle for transmitting predicate acts of wire fraud. On August 27, 2025, Donaldson, using the email address marcia@hiddengemsventures.com, transmitted a mass email to the HGV investor network, including Plaintiffs, promoting a fraudulent "Secure, High Yield Banking Opportunity for Our Network." This email falsely represented that funds deposited would be "not used in deals," remain "100% available," and earn an annualized return of approximately 10%. These representations were made to solicit new capital to perpetuate the insolvent Enterprise.

47.    HGV continued to transmit fraudulent "lulling" communications to suppress lender inquiry as the Enterprise collapsed. On October 28, 2025, and again on December 10, 2025, Donaldson sent emails from her HGV email address to the investor network. These emails were designed to project stability by announcing new hires, citing fabricated performance metrics like "$500,000 in assets per week" being refinanced, and explaining away significant repayment delays as "purely administrative," when in reality the Enterprise was insolvent and Plaintiffs' funds were unrecoverable.

48.    HGV's actions were a direct and proximate cause of Plaintiffs' decision to invest and their subsequent financial losses.

**Defendants HGTC**

48.     Defendant Hidden Gems TC Services LLC ("HG TC"), a Florida limited liability company solely owned and controlled by Defendant Donaldson, operated from the same address and with the same infrastructure as HGV. While HGV solicited Plaintiffs into the scheme, HG TC executed the financial mechanics of the fraud, assuming a role that far exceeded its purported function as a "transaction coordinator" and the role contemplated in contractual agreements with Plaintiffs.

49.     In practice, and violation of the contractual agreements executed with Plaintiffs, HG TC assumed total and discretionary control over the closing process for every transaction funded by Plaintiffs. HG TC systematically inserted itself as the exclusive communication gatekeeper between Plaintiffs and the Title Defendants.

50.     In standardized opening emails to title companies for transactions funded by Plaintiffs, HG TC issued the verbatim instruction: *"We will be your point of contact and request all communication goes through us. Please do not reach out to the Funding Partners; we will provide any details you may need."*

51.     By enforcing this communication blockade, HG TC ensured Plaintiffs were completely excluded from the closing process. Plaintiffs were never provided with a settlement statement to review or approve prior to the disbursement of their funds. They were not asked to sign closing documents, and they never spoke directly to the Title Defendants handling their funds.HGTC's conduct in this regard breached fiduciary duties to Plaintiffs.

52.     HG TC affirmatively represented to the Title Defendants that it would obtain and convey lender approval for all disbursements, and this representation was relied upon by the Title Defendants. HG TC's written confirmation of "lender approval" functioned as a required condition

precedent to the disbursement of Plaintiffs' funds at every closing; no title company would release Plaintiffs' funds without it.

53.     HG TC breached its duties by transmitting written confirmations to title companies falsely representing that lender approval for disbursements had been obtained, when in fact Plaintiffs had never seen the settlement statements and had not given any such approval.

54.     Based on these false representations, HG TC directed and approved the disbursement of Plaintiffs' funds for purposes that were undisclosed, unauthorized, and inconsistent with their lending agreements. These unauthorized disbursements included, among others: a. Substantial "assignment fees" to undisclosed third-party entities, such as a $55,000 fee to "Lab LLC" that consumed the entirety of one of SummitBridge's loans and a $55,000 assignment fee to WTO Investors Group LLC. b. Payoffs to prior lenders that were not disclosed in Plaintiffs' transaction documents. c. Fictitious commissions to related entities, such as fees to "Estella Management LLC" on uninhabitable properties where no property management function was performed, and numerous $5,000 transaction fees to "Starpoint". d. Dual invoices on the same closing for both HG TC and HGV, both entities solely owned by Donaldson, in violation of Plaintiffs' agreements.

55.     Although on certain deals Donaldson required Plaintiffs to sign a "Transaction Coordination Agreement" purporting to assign due diligence responsibility to the client, HG TC's actual conduct materially exceeded any limited administrative role described therein. Such an agreement does not permit HG TC to: (a) affirmatively misrepresent that lender approval had been obtained when it had not; (b) approve disbursements without authorization; (c) draft and prepare mortgage statements or (d) exercise total control over the disbursement of Plaintiffs' funds without

exercising reasonable care. HG TC's duties arise from its affirmative undertaking and conduct, independent of any purported contractual limitation.

56.    Following each closing, HG TC compounded its breach of fiduciary duty and by controlling the flow of information back to Plaintiffs. Donaldson, through HG TC, transmitted closing packages to Plaintiffs that systematically and intentionally omitted the settlement statements and escrow ledgers—the only documents that would have revealed the unauthorized disbursements and diversion of funds. This ensured Plaintiffs received evidence of their purported security interest (e.g., a promissory note or mortgage) while being kept ignorant of the fact their money had been misappropriated at closing.

57.    These actions were not ministerial; they were discretionary acts of control and deception that were the direct and proximate cause of Plaintiffs' losses. But for HG TC's false confirmations of lender approval and its concealment of the settlement statements, the Title Defendants would not have disbursed Plaintiffs' funds in the manner they did, and the fraud could not have been executed.

58.    In transaction after transaction, HG TC, acting through Donaldson, approved settlement statements containing unauthorized disbursements. These disbursements, which were never disclosed to Plaintiffs, included substantial assignment fees to undisclosed entities, payments to third parties unrelated to the properties, payoffs to prior lenders not reflected in any transaction documents, and dual fees paid to both HG TC and HGV on the same closing. Title Defendants relied on HG TC's false confirmations of lender approval in disbursing Plaintiffs' funds for these unauthorized purposes. The following are representative examples of the fraudulent conduct:

59.    **4330 Maryland Street, Gary, Indiana (May 28, 2025):** The $55,000 wired by SummitBridge for this transaction was entirely consumed by a single $55,000 "Assignment Fee"

paid to an entity named Lab LLC. This entity was never disclosed to SummitBridge, and its role was never authorized. Contrary to the Joint Venture Funding Agreement, not a single dollar of Plaintiffs' funds was allocated for property acquisition or rehabilitation. HG TC approved this disbursement without Plaintiffs' knowledge or consent.

60.    **1807 South Kerth Avenue, Evansville, Indiana (August 12, 2025):** In this $156,000 loan transaction, HG TC authorized a disbursement of $121,999.58 as a payoff to Golden Legacy Ventures LLC and $4,750 as a "Finders Fee" to Pink Lotus Consultants. SummitBridge later learned that Golden Legacy Ventures received only approximately $80,000; the remaining $41,999.58, reflected on the settlement statement as paid to Golden Legacy Ventures, remains unaccounted for. SummitBridge never authorized these disbursements and never received the settlement statement prior to closing.

61.    **448 Matthews Street, Gary, Indiana (August 28–29, 2025):** The settlement statement for this $84,000 loan reflects a commission to Estella Management LLC, a property management company, despite the property being completely dilapidated and uninhabitable, with no tenants to manage or rents to collect. No basis existed for this commission, and it was never disclosed to or authorized by SummitBridge.

62.    **569 Maryland Street, Gary, Indiana (August 29, 2025):** The settlement statement for this $110,000 loan reflects numerous unauthorized and undisclosed disbursements, including a $50,000 "Assignment Fee" to WTO Investors Group LLC, a $5,000 "Transaction Fee" to Starpoint Holdings LLC, and a $2,000 commission to Estella Management LLC.

63.    **1941 West 10th Place, Gary, Indiana (October 24, 2025):** The settlement statement for this $100,000 loan funded by ARNA reflects an undisclosed payoff to SIMAYA Innovation LLC in the amount of $112,787.50—a figure exceeding the entire loan amount. It also

reflects four separate, unauthorized fee disbursements: a $2,000 fee to Estella Management LLC, a $2,000 fee to HG TC, a $1,500 fee to HGV, and a $5,000 fee to Starpoint Holdings. This property was never rehabbed.

64.    **933 East Ridge Road, Gary, Indiana (November 7, 2025):** In this $43,000 loan funded by ARNA, Donaldson never disclosed that the proceeds would be used to pay off prior debt obligations, contrary to the loan's stated purpose. The settlement statement further reflects three undisclosed and unauthorized fees to HG TC, HGV, and an entity named RPKP. On this transaction, HG TC submitted dual invoices against the same closing—one from HG TC and one from HGV—both entities solely owned and controlled by Donaldson, without disclosure to or authorization from ARNA.

65.    **The 5088 Queens Avenue Misappropriation and Cover-Up:** Donaldson's direct knowledge of and participation in the fraud is exemplified by this transaction. SummitBridge's funds from a prior transaction were rolled into the 5088 Queens Avenue deal without SummitBridge's knowledge. When the loan matured, Donaldson did not repay SummitBridge but instead offered a higher interest rate to delay payment, all while concealing that the funds had already been disbursed directly to Defendant Barker. Donaldson knew this as early as June 27, 2025, when she was copied on an email from Barker to the title company stating that the closing was an "equity rollover" and that the borrower received funds "notionally, not via actual wire." Barker conditioned the deal on Donaldson's confirmation, which she gave. Three months later, on October 1, 2025, with full knowledge that SummitBridge's funds were gone, Donaldson induced SummitBridge to execute a new Joint Venture Funding Agreement for the transaction, a fabricated instrument designed to conceal the misappropriation and suppress inquiry. The procurement of this agreement constitutes fraud in the inducement and a predicate act of wire fraud.

66.    To the extent that HGV and HGTC rely on contractual agreements signed by Plaintiffs pursuant to fraudulent representations, such agreements are null and void.

**Defendant Donaldson**

57.    Defendant Marcia Donaldson, an individual residing in Florida, was the architect and operator of the marketing and transaction coordination components of the Enterprise. She is the sole owner, manager, principal, and agent of both HGV and HG TC and operated them as a single, integrated enterprise.t.

58.    Donaldson personally solicited Plaintiffs and other PMLs, inducing their investment through a series of false representations and personal guarantees transmitted in interstate commerce to Plaintiffs in New York. In direct text messages with a principal of Plaintiff ARNA Premier Property Solutions, Donaldson made explicit personal guarantees to induce reliance and continued investment, stating: "Neelema, I will pay you myself if this goes sideways"; and "You will always be taken care of by me." She further represented herself as a co-investor, stating, "I am also funding a project closing tomorrow for $35k. I would not ask someone to do a deal I'm not willing to do."

59.    These representations were false. Donaldson was not a co-investor alongside Plaintiffs; she was extracting undisclosed fees from the very transactions she was inducing Plaintiffs to fund, through her wholly-owned entities HGV and HG TC.

60.    Donaldson used her public persona and various social media channels to broadcast these misrepresentations to Plaintiffs and a national audience of prospective lenders. On her public LinkedIn profile, she held herself out as a "Private Equity Investor | Helping Professionals Earn Double-Digit Returns on Idle Cash by Investing in Real Estate Loans." In an undated video posted on Facebook, she assured potential investors, "Where I come in is, I bridge that gap, I have

thoroughly vetted this Real Estate investor. I have deployed over $500,000 of my personal money with them and been paid back."

61.    Donaldson extended her personal control beyond solicitation and into the legal execution of the transactions. On multiple transactions funded by Plaintiffs, Donaldson personally prepared the mortgage instruments intended to secure their investments. She did so without disclosing that she, rather than a licensed attorney, was drafting these crucial legal documents.

62.    To conceal her unauthorized role, Donaldson falsified the "prepared by" field on certain recorded mortgages arising from Plaintiff transactions. Instead of listing her name or her company's name, she listed the lender's name, thereby misattributing authorship of the legal instrument to Plaintiffs and ensuring any legal deficiency would appear to be the lender's own error. This was at the very least a breach of fiduciary duty and negligent conduct..

63.    As early as June 27, 2025, Donaldson had direct knowledge that funds were being misappropriated. On that date, Defendant Barker emailed a title company—copying Donaldson at both her HGV and HG TC email addresses—stating that a closing was an "equity rollover" and the borrower would receive funds "'notionally,' not via actual wire." Barker conditioned the deal on Donaldson's confirmation, which she provided.

64.    Knowing that Plaintiff SummitBridge's funds from that deal were gone, Donaldson concealed this fact from SummitBridge. Three months later, she induced SummitBridge to execute a new Joint Venture Funding Agreement on October 1, 2025, for the same transaction, creating a fabricated paper trail to conceal the prior misappropriation and lull SummitBridge into inaction. Donaldson also personally enforced the isolation of Plaintiffs from the closing process through economic coercion. When a principal of SummitBridge contacted another borrower network, Donaldson reprimanded her via text message, stating, "I don't like that you are working between

me and Maria... we don't share PMLs," and threatened her that Defendant Barker "does not want you funding another project."

65.    Every fraudulent solicitation, lulling communication, and act of concealment directed at Plaintiffs in New York was personally orchestrated, executed, or ratified by Donaldson through interstate wires (email, social media, and text messages), providing a basis for personal jurisdiction. She has not repaid Plaintiffs or honored her personal guarantees.

## ALLEGATIONS AS TO THE SCHEME

73.    In total, Plaintiffs were fraudulently induced to convey substantial funds to Defendants, of which at least $755,000 was diverted from Plaintiff Summitbridge and $374,000 was diverted from Plaintiff Arna, for a total of at least $1,129,000, all of which is at immediate risk of dissipation.

74.    The Lighthouse Defendants, led by V. Barker, solicited Plaintiffs and other private lenders ("PMLs") to fund purported fix-and-flip real estate projects, promising first-position liens, regular updates, and repayment of principal with interest.

75.    The funds at issue were conveyed across numerous transactions, including but not limited to the following:

- o    From Summitbridge on or about September 26, 2025, in the amount of $51,000 to Lighthouse Estates LLC through Legal Title and Escrow.

- o    From Summitbridge on or about October 6, 2025, in the amount of $68,000 to Lighthouse Estates LLC through First Class.

- o    From Summitbridge on or about October 13, 2025, in the amount of $70,000 to Lighthouse Estates LLC through Elite Title.

o   From Summitbridge on or about October 30, 2025, in the amount of $50,000 to Lighthouse Estates LLC through Members Title.

o   From Summitbridge on or about November 12, 2025, in the amount of $156,000 to Lighthouse Estates LLC through True Title.

o   From Summitbridge on or about November 27, 2025, in the amount of $55,000 to Lighthouse Estates LLC through True Title.

o   From Summitbridge on or about November 28, 2025, in the amount of $110,000 to Lighthouse Estates LLC through True Title.

o   From Summitbridge on or about November 28, 2025, in the amount of $84,000 to Lighthouse Estates LLC through True Title.

o   From Summitbridge on or about December 4, 2025, in the amount of $20,000 to CeeKou LLC through True Title.

o   From Summitbridge on or about December 4, 2025, in the amount of $14,000 to AVS Estates LLC through True Title.

o   From Summitbridge on or about December 16, 2025, in the amount of $50,000 to Lighthouse Estates LLC through First Class.

o   From Summitbridge and Arna on or about October 14, 2025, in the amount of $77,000 to Lighthouse Estates LLC through First Class.

o   From Arna on or about October 23, 2025, in the amount of $31,000 to Lighthouse Estates LLC through Perpetual Title OH.

o   From Arna on or about November 26, 2025, in the amount of $100,000 to Redwoods Real Estate LLC through True Title.

o   From Arna on or about November 27, 2025, in the amount of $55,000 to Lighthouse Estates LLC through University Title.

o   From Arna on or about December 6, 2025, in the amount of $43,000 to Taihe Estates LLC through True Title.

o   From Arna on or about December 11, 2025, in the amount of $95,000 to Lighthouse Estates LLC through Elite Title.

76.     The total amount diverted from Summitbridge is $755,000 and the total amount diverted from Arna is $374,000. The total amount is $1,129,000.

77.     The Lighthouse Defendants materially misrepresented and concealed facts from Plaintiffs, including:

•   Failing to disclose that rehabilitation work had or never commenced;

•   Requesting lenders to sign pre-mature releases of mortgage before repayment;

•   Providing misleading or recycled photographs to falsely suggest progress;

•   Concealing that properties were subject to municipal code violations and demolition orders;

•   Failing to record liens without lender knowledge or consent.

78.     As the Lighthouse Defendants' cash position deteriorated in 2025, the Transaction Coordinator Defendants, led by Defendant Marcia Donaldson, began promoting an additional "banking" product to Plaintiffs and other private money lenders as part of the same enterprise.

79.     On or about August 27, 2025, Defendant Donaldson sent an email to the investor network with the subject line "A Secure, High Yield Banking Opportunity for Our Network," touting a so called partnership between Lighthouse Estates and "Peoples Bank," which she

described as "the same bank that backs our Hard Money Lender, Kentucky Private Lending (KPL)." In that email, Donaldson encouraged recipients to "help… grow [Peoples Bank's] deposits and client base through our network."

80.     In the August 27, 2025 email, Donaldson represented that deposits placed with Peoples Bank through the Lighthouse network would be (a) "not used in deals," (b) "100% available to their holders, just like a traditional savings or money market account," and (c) eligible for an "additional 0.2% per week (~10% annualized)" return—purportedly a "fantastic return for funds that stay fully liquid and secure."

81.     Donaldson further stated that increasing deposits at Peoples Bank would "strengthen[] all of us," because "a stronger relationship with Peoples Bank means more stability for KPL and continued growth for Lighthouse Estates and our entire PML network," and urged recipients to refer "friends or family who may not want the risk of private money lending but still want their money working harder than it would in a typical bank."

82.     These statements were materially misleading and omitted key facts. At the time Donaldson sent this email, the Lighthouse Defendants and Transaction Coordinator Defendants knew, or recklessly disregarded, that: (a) the Lighthouse enterprise was already insolvent or functionally insolvent; (b) incoming funds—whether characterized as "deposits," "private money loans," or otherwise—were being commingled and used to service prior obligations and operating shortfalls, not kept "outside" the deals; and (c) there was no legitimate, disclosed mechanism by which Peoples Bank would pay "0.2% per week (~10% annualized)" on fully liquid deposits without exposing those funds to lending or investment risk.

83.     By marketing this "secure, high yield banking opportunity" through the same Lighthouse/Hidden Gems network and tying it expressly to "more stability for KPL and continued growth for Lighthouse Estates and our entire PML network," Donaldson and the other

Transaction Coordinator Defendants used the wires to solicit additional capital under false pretenses and to expand the pool of victims beyond existing private money lenders.

84.    The August 27, 2025 email and similar communications from Donaldson constitute predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343 and are part of the pattern of racketeering activity alleged herein, because they (a) formed a material part of the overall scheme to obtain money from Plaintiffs and other investors by means of false and fraudulent pretenses, representations, and promises, and (b) were transmitted in interstate commerce via email in furtherance of that scheme.

85.    The Lighthouse Defendants further concealed a unilateral shift in business strategy starting in late 2025—rolling lender principal into new deals or refinancing structures—without lender disclosure or approval, depriving Plaintiffs of informed consent.

86.    Investor funds were commingled and misappropriated, with incoming funds used to pay prior investors rather than for the designated properties, a hallmark of a Ponzi scheme. *See* SEC v. Loewenson, 290 F.3d 80 (2d Cir. 2002).

87.    The Transaction Coordinator Defendants served as transaction coordinators for each of the transactions listed hereinabove. In serving as transaction coordinators, Donaldson and Hidden Gems were negligent and failed to exercise due diligence or anything resembling a reasonable duty of care.

88.    The Transaction Coordinator Defendants, through negligence, facilitated above Defendants' unlawful actions in violation of the RICO Act.

89.    The Title Company Defendants similarly, through negligence, facilitated the Lighthouse unlawful activities.

90.    On December 17, 2025, federal agents arrested Defendant Van Laurence Barker in connection with a nationwide federal investigation known as "Operation Relentless Justice,"

a coordinated national child-exploitation enforcement initiative led by the Department of Justice and the Federal Bureau of Investigation and involving all fifty-six FBI field offices across the United States. Defendant Barker was taken into federal custody that same day.

91.    The following day, on or about December 18, 2025, the United States Department of Justice publicly announced the results of the operation and identified Defendant Barker as one of the individuals targeted, charged, and arrested in connection with the operation arising from alleged attempted online enticement of a minor and related child-exploitation conduct. Those charges were brought by the United States Attorney's Office for the Western District of Kentucky and are captioned United States of America v. Barker, Case Nos. 3:25-mj-00076-RSE and 3:26- cr-00002-RGJ, currently pending before the United States District Court for the Western District of Kentucky.

92.    Following his arrest, Barker was remanded into federal custody and remains confined pending further proceedings in United States v. Barker, Case No. 3:26-cr-00002-RGJ.

93.    Barker's arrest, prosecution, and present incarceration on serious federal felony charges coincided with, and materially exacerbated, Defendants' sudden cessation of communications with Plaintiffs, the shutdown of enterprise-related websites and social media accounts, and the obstruction of access to financial records and transaction information. These events further evidence Defendants' consciousness of wrongdoing, the instability of the enterprise, and the imminent risk that assets entrusted to Defendants by Plaintiffs would be concealed, dissipated, or fraudulently transferred absent immediate judicial intervention.

94.    Barker's status as a federally charged defendant arising from a nationwide law-enforcement operation underscores the gravity of his unlawful conduct and the ongoing risk he poses to at least 100 other PMLS including Plaintiffs, who entrusted him and his controlled entities with substantial sums of money.

95.     In early January 2026, the Lighthouse Defendants abruptly deactivated social media accounts, suspended access to professional websites, ceased communications, and blocked access to internal records, evidencing consciousness of guilt and risk of asset dissipation.

96.     Plaintiffs began reaching out in desperation to other Lighthouse PMLs to figure out whether their life savings were gone. A private Facebook chat group quickly formed, revealing that lender after lender had been left in the dark and abandoned, most notably by Defendant Marcia Donaldson, who had suddenly vanished from the very network she had helped build and promote. This was not an isolated misunderstanding; it was a pattern of silence in the face of looming, catastrophic loss.

97.     In a scramble to contain what had become widespread panic over massive, unrepaid principal, the potential shock to Midwestern housing markets, and the looming collapse of the hard money platform itself, Defendants did not offer transparency or a concrete repayment plan. Instead, they brought in non-party Maria Bock of BuenaVida Consulting to stage-manage a Zoom meeting on January 6, 2026, designed to placate furious PMLs and preserve "buy-in," rather than to candidly disclose just how dire the situation truly was.

98.     In the days leading up to that meeting, Defendant Kennedy circulated a written statement that amounted to a stunning admission that Lighthouse had been operating on a Ponzi-like chassis. Kennedy acknowledged that:

> Our BRRR strategy became constrained when DSCR takeout financing slowed significantly and underwriting timelines expanded. Properties that were intended to refinance quickly remained unfinished or overleveraged longer than planned.
>
> In mid-2025, we attempted to solve this through institutional DSCR financing via People's Bank, introduced by KPL. While promising, the process was slow and underwriting intensive and it did not produce liquidity fast enough to meet short-term obligations.

> To bridge that gap, a temporary system evolved where KPL and PML loans were effectively recycled internally. Operating costs and debt service were all supported by retained capital being rolled forward into new transactions. That system only works when inflows remain uninterrupted.

Once inflows slowed and leadership disruption occurred, the model became unsustainable.

Stripped of euphemisms, this "temporary system" was nothing more than using new lender money to plug old holes: recycling PML and KPL loans to pay operating expenses and prior debt, while properties languished unfinished and overleveraged, and while PMLs were fed reassurances instead of truth. On January 6, 2026, the Lighthouse Defendants informed Plaintiffs and 100 other PMLs over a Zoom call that they would not honor personal guarantees or promissory notes requiring prompt return of funds to Plaintiffs.

**Additional Allegations as to Defendant Bluestar Capital LLC**

67.     Defendant Bluestar Capital LLC ("Bluestar") is a limited liability company owned in substantial part by Brian Barker and Defendant Starpoint Holdings LLC, and was used as a reserve and capital-backing entity for the Enterprise.

68.     In August–September 2025, Brian Barker, acting through Bluestar, wired a substantial sum of money—upon information and belief, ranging from several hundred thousand dollars to over one million dollars—into the accounts of Starpoint and/or Lighthouse. This capital infusion was disclosed to Plaintiff SummitBridge by Defendant Donaldson, who stated she was "really excited about it," and Plaintiffs relied on this assurance of financial stability in making subsequent investments.

69.     At the time it made this capital infusion, Bluestar, acting through Brian Barker, had actual knowledge of, or acted in reckless disregard of, facts demonstrating the Enterprise's insolvency and fraudulent nature, including that: (i) the Enterprise was unable to meet its obligations to existing PMLs; (ii) rehabilitation work on multiple properties had stalled or never

commenced; (iii) the Enterprise's refinancing strategy had failed; (iv) incoming lender capital was being "recycled internally" to service prior obligations rather than being used for its designated purpose; and (v) the Enterprise's cash position was so dire that it required an emergency injection of family capital to avoid immediate collapse.

70.     Upon information and belief, Bluestar knowingly participated in a scheme to extract Plaintiffs' funds through the use of fabricated invoices. The Enterprise created fictitious invoices in Bluestar's name and submitted them to third-party title companies to be embedded as line items in the HUD settlement statements for PML-funded transactions. The purpose of this practice was to route closing proceeds derived from Plaintiffs' funds directly to Bluestar, bypassing standard banking channels and concealing the transfers. Bluestar received these payments under fictitious line items that corresponded to no legitimate service rendered, and it necessarily knew the invoices were fabricated.

71.     Upon information and belief, Bluestar also engaged in a pattern of predatory, short-term lending to the Enterprise, which provided it with continuous, real-time visibility into the Enterprise's dire cash position. These were not isolated transactions but a recurring arrangement whereby Bluestar would advance funds and demand exorbitant returns within days, such as advancing $30,000 and demanding repayment of $35,000 within one week—an effective annualized interest rate of approximately 867%. This pattern demonstrates that Bluestar was an active transactional counterparty that monitored the Enterprise's weekly cash flow, and it used its position to extract returns derived from the commingled funds of defrauded lenders, including Plaintiffs.

72.     Bluestar's wire transfer of emergency capital into the insolvent Enterprise constituted a predicate act of wire fraud under 18 U.S.C. § 1343, as it was made to sustain a Ponzi-

like operation long enough to induce further investments from Plaintiffs. Further, Bluestar's receipt of distributions in excess of $10,000, which were derived from defrauded PML capital through fabricated HUD entries and other means, constitutes money laundering under 18 U.S.C. § 1957.

## RICO ENTERPRISE ALLEGATIONS

83.    The Lighthouse Defendants and Defendant Bluestar Capital LLC, together constituted an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). The Enterprise was a group of individuals and legal entities associated together for the common purpose of carrying on an ongoing fraudulent course of conduct.

84.    The Enterprise was engaged in, and its activities affected, interstate and foreign commerce. It solicited investments from and directed communications to Plaintiffs in New York and other private money lenders across the country; acquired and purported to renovate properties in multiple states, including Indiana, Ohio, Kentucky, Alabama, and Missouri; and utilized interstate wires, including email, social media platforms, and banking systems, to execute its fraudulent scheme.

85.    The members of the Enterprise shared the common purpose of enriching themselves by fraudulently inducing Plaintiffs and other PMLs to invest in a purported real estate business, and then misappropriating and commingling investor funds in a Ponzi-like scheme to pay earlier investors, cover operating shortfalls, and fund their own personal and business interests.

86.    The Enterprise had an ascertainable structure with defined roles, which persisted over time. The Lighthouse Defendants, led by V. Barker and Kennedy, controlled the borrower entities and directed the overall scheme.

87.    The Transaction Coordinator Defendants, directed by Donaldson, were responsible for marketing and solicitation (HGV) and controlling the transaction closings to enable the misappropriation of funds (HG TC).

88.    Defendant Bluestar participated by providing critical capital infusions to sustain the insolvent enterprise and by receiving the proceeds of the fraud through illicit means.

89.    The Lighthouse Defendants and Bluestar conducted and/or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1) and in violation of 18 U.S.C. § 1962(c).

90.    The pattern of racketeering activity consisted of numerous, repeated predicate acts, including but not limited to wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. § 1957). These acts were related and continuous.

91.    **Predicate Acts of Wire Fraud (18 U.S.C. § 1343):** Defendants devised and executed a scheme to defraud Plaintiffs and obtain money by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme, transmitted writings, signs, signals, pictures, and sounds in interstate commerce. These acts include, without limitation: a. HGV's fraudulent social media posts on December 10, 2024, and April 8, 2025, which contained false representations about the Enterprise's track record, the security of the investments, and the expected returns, and which were directed at Plaintiffs and other PMLs nationwide. b. Donaldson's personal solicitations and false guarantees transmitted via interstate text message and email to Plaintiffs in New York, including her promises to personally cover losses and her misrepresentations about being a co-investor. c. Donaldson's and HGV's mass emails of August 27, 2025, promoting the fraudulent "Peoples Bank" scheme, falsely representing that funds would be secure and liquid when Defendants knew the Enterprise was insolvent and

intended to use the funds to service prior obligations. d. Donaldson's and HGV's "lulling" emails of October 28, 2025, and December 10, 2025, which were designed to suppress inquiry and prevent Plaintiffs from taking action by falsely explaining away payment delays as "purely administrative" and citing fabricated performance metrics. e. HG TC's repeated emails to Title Defendants falsely confirming that "lender approval" had been obtained for disbursements, thereby inducing the title companies to release Plaintiffs' funds for unauthorized purposes. f. Donaldson's procurement of a fabricated Joint Venture Funding Agreement from SummitBridge on October 1, 2025, transmitted via interstate wire, to conceal the prior misappropriation of funds in the 5088 Queens Avenue transaction. g. Bluestar's wire transfer of emergency capital into the Enterprise in August-September 2025, made with actual knowledge of or in reckless disregard for the Enterprise's fraudulent nature, for the purpose of sustaining the Ponzi-like scheme long enough to defraud later investors, including Plaintiffs.

92.     **Predicate Acts of Money Laundering (18 U.S.C. § 1957):** Upon information and belief, Defendant Bluestar knowingly engaged in monetary transactions by, through, or to a financial institution, in criminally derived property of a value greater than $10,000 that was derived from the specified unlawful activity of wire fraud. Specifically, Bluestar received distributions derived from defrauded PML capital through fabricated HUD entries, wire transfers, and short-term lending arrangements.

93.     The predicate acts were **related** to each other, as they shared the same purposes (to induce investment and conceal the fraud), victims (Plaintiffs and other PMLs), and methods of commission (use of interstate wires to make material misrepresentations), and involved the same core participants.

94.     The pattern of racketeering activity had **continuity**. The predicate acts occurred over a substantial period of time, from at least December 2024 through December 2025, and constituted the Enterprise's regular way of conducting its business. The scheme threatened continued fraudulent activity and was only halted by the external event of Defendant V. Barker's federal arrest, demonstrating open-ended continuity. The very nature of the Ponzi-like scheme, which required a continuous stream of new investor money to survive, establishes a threat of continued criminal activity.

## CLAIMS FOR RELIEF

### COUNT I
### CIVIL RICO (18 U.S.C. §§ 1962(c), 1964) AGAINST LIGHTHOUSE DEFENDANTS

95.     The Lighthouse Defendants conducted and participated in an enterprise and/or cooperative legal entity affecting interstate commerce. The Lighthouse Defendants had a common purpose, with business relationships, existing sufficiently long enough to pursue the purpose of defrauding PMLs and Plaintiffs. United States v. Burden, 600 F.3d 204 (2d Cir. 2010).

96.     The Lighthouse Defendants conducted and/or participated, directly and/or indirectly, in the conduct of an enterprise's affairs to a certain degree of control and direction. Dicicco v. Emigrant Bank (In re Dicicco), Nos. 1-22-42468-jmm, 1-23-01079-jmm, 2025 LX 321261 (Bankr. E.D.N.Y. Aug. 26, 2025).

97.     The Lighthouse Defendants, in violation of 18 U.S.C. § 1961(1), executed repeated fraudulent communications, including but not limited to, mail fraud, wire fraud, bank fraud, obstruction of justice, and money laundering to induce investments, conceal misuse of funds, and lull lenders into inaction.

98.    The Lighthouse Defendants' collective acts were related and open-ended continuity. RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 136 S. Ct. 2090 (2016).

99.    Plaintiffs suffered concrete financial loss by reason and proximate cause of Lighthouse Defendants' RICO violations. *See* Yegiazaryan v. Smagin, 599 U.S. 533, 143 S. Ct. 1900 (2023).

## COUNT II

## FRAUD AGAINST THE LIGHTHOUSE DEFENDANTS

100.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

101.    The Lighthouse Defendants knowingly made false statements and omissions of material fact, intending Plaintiffs' reliance.

102.    Plaintiffs justifiably relied on the Lighthouse Defendants' representations and were damaged thereby. *See* Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996).

103.    Plaintiffs' reliance was a substantial factor in causing actual harm and damages.

## COUNT III: NEGLIGENCE / PROFESSIONAL NEGLIGENCE (Transaction Coordinator & Title Defendants)

105.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

106.    The Transaction Coordinator Defendants, HG TC and Marcia Donaldson, undertook to provide professional transaction coordination services in connection with the closings funded by Plaintiffs. By assuming this role and exercising control over the closing process, they

owed Plaintiffs a duty to exercise the reasonable care and competence expected of professionals in their field. This duty included, but was not limited to, the duties to: provide Plaintiffs with all closing documents for review, including settlement statements; obtain Plaintiffs' informed consent prior to authorizing disbursements; accurately communicate Plaintiffs' instructions and approval status to title companies; and refrain from approving unauthorized or undisclosed disbursements inconsistent with Plaintiffs' lending agreements.

107.    The Title Defendants, as escrow and closing agents, owed Plaintiffs a duty to act as a neutral stakeholder and to handle Plaintiffs' funds with reasonable care, to ensure that liens securing Plaintiffs' investments were properly recorded, and to disburse funds only in accordance with the lender's authorization.

108.    The Transaction Coordinator Defendants breached their duties through numerous acts of negligence, gross negligence, and professional malfeasance, including but not limited to: a. Systematically excluding Plaintiffs from the closing process and instructing title companies not to communicate with them. b. Failing to provide Plaintiffs with settlement statements for review and approval prior to closing. c. Falsely representing to the Title Defendants that Plaintiffs' approval for disbursements had been obtained when it had not. d. Authorizing and directing numerous disbursements of Plaintiffs' funds that were undisclosed, not authorized by Plaintiffs' lending agreements, and which diverted funds to themselves and other third parties. e. Defendant Donaldson's unauthorized practice of law in preparing mortgage instruments intended to secure Plaintiffs' loans and her falsification of the "prepared by" field to conceal her actions.

109.    The Title Defendants breached their duty of care by, among other things, facilitating the improper disbursement of Plaintiffs' funds in reliance on the unverified representations of HG TC, failing to communicate directly with the lenders whose funds they held

in escrow, failing to ensure the proper recording of liens, and processing transactions containing material irregularities without obtaining direct confirmation from Plaintiffs.

110.    These breaches directly and proximately caused Plaintiffs' losses. But for the Transaction Coordinator Defendants' false confirmations of lender approval and concealment of closing documents, and the Title Defendants' negligent failure to verify authorization before disbursing funds, Plaintiffs' funds would not have been misappropriated.

111.    The Transaction Coordinator Defendants' liability arises from their negligent acts, errors, and omissions in the performance of professional services and is independent of any purported contractual limitation or disclaimer. As a direct result of these breaches, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $1,129,000.

## COUNT IV: BREACH OF FIDUCIARY DUTY
### (Against the Transaction Coordinator Defendants)

112.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

113.    A fiduciary relationship existed between Plaintiffs and the Transaction Coordinator Defendants—HGV, HG TC, and Marcia Donaldson. Plaintiffs reposed a special trust and confidence in these Defendants, who held themselves out as trusted intermediaries and undertook to act on Plaintiffs' behalf in the critical aspects of the closing process.

114.    The Transaction Coordinator Defendants accepted this position of trust and exercised superior control over Plaintiffs' funds and financial interests. They accomplished this by positioning themselves as the exclusive conduit for all communications and approvals between Plaintiffs and the Title Defendants, systematically excluding Plaintiffs from the closing process, and assuming the non-delegable responsibility of approving settlement statements and authorizing the disbursement of Plaintiffs' funds.

115. By virtue of this relationship of trust, control, and reliance, the Transaction Coordinator Defendants owed Plaintiffs the highest fiduciary duties of loyalty, candor, good faith, and full disclosure.

116. The Transaction Coordinator Defendants breached these fiduciary duties through numerous acts of self-dealing and bad faith, including but not limited to: a. Approving undisclosed disbursements of Plaintiffs' funds to third parties and insiders, contrary to Plaintiffs' interests and lending agreements. b. Engaging in self-dealing by extracting undisclosed compensation, including duplicative fees for both HGV and HG TC from the same transaction, thereby placing their own financial interests ahead of their duty to Plaintiffs. c. Actively concealing material information necessary for Plaintiffs to protect their financial interests, including by systematically withholding settlement statements that would have revealed the fraud and misappropriation. d. Failing to disclose their conflicts of interest while purporting to act as a neutral intermediary for Plaintiffs.

117. As a direct and proximate result of the Transaction Coordinator Defendants' breaches of their fiduciary duties, Plaintiffs have suffered damages in an amount to be proven at trial, but not less than $1,129,000.

**INJUNCTIVE RELIEF**

118. Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

119. Defendants' ongoing control over investor funds, loan proceeds, and real estate and non-real estate assets obtained through the Lighthouse enterprise presents an imminent risk of further dissipation and concealment of assets that should be available to satisfy judgments in favor of Plaintiffs and similarly situated PMLs. As Defendants themselves have admitted, for an

extended period they "recycled" PML and KPL funds to pay operating costs and debt service, rolled capital forward into new transactions, and depended on uninterrupted inflows of new money to sustain an undisclosed, Ponzi-like structure.

120.    Unless enjoined, Defendants are likely to: (a) transfer, encumber, or liquidate enterprise properties; (b) divert remaining cash or refinance proceeds to insiders and affiliated entities; (c) funnel funds through out-of-state or out-of-country accounts; and (d) destroy or alter books, records, and electronic data that would reveal the full extent of their racketeering activity. Such conduct would irreparably harm Plaintiffs by rendering any monetary judgment hollow and by frustrating meaningful tracing of funds.

121.    Money damages alone are inadequate because: (a) the universe and location of assets subject to execution is presently unknown and deliberately obscured; (b) the enterprise used multiple entities, title companies, and lenders to move and recycle funds; and (c) once real property is transferred or encumbered in favor of new, allegedly bona fide parties, unwinding those transactions will be costly, uncertain, and in many cases impossible. Injunctive relief is therefore necessary to preserve the status quo and maintain the Court's ability to grant effective final relief.

122.    Plaintiffs seek immediate injunctive relief to:

1.  Freeze Defendants' assets;

2.  Enjoin further transfers of lender funds;

3.  Preserve documents and electronic records.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief:

a. temporary restraining order and preliminary injunction prohibiting Defendants, and all persons acting in concert with them, from directly or indirectly transferring, encumbering, dissipating, concealing, or otherwise disposing of:

- any real property acquired, held, or marketed by Lighthouse Estates LLC, Red Door Legacy, Redwoods Real Estate LLC, and other identified enterprise entities; and

- any proceeds, loan funds, or investor monies traceable to the PML loans described in this Complaint.

b. An order requiring Defendants to provide, within a short, fixed period (e.g., 10 business days), a sworn, itemized accounting of:

- all PML and KPL funds received since the start of the Lighthouse program;

- all bank, brokerage, and other financial accounts used to receive or disburse those funds; and

- all transfers over a specified threshold (e.g., $5,000) to insiders, affiliates, or foreign accounts.

c. The appointment of a limited-purpose receiver or special master, at least on an interim basis, to:

4. take control of specified enterprise bank accounts;

5. oversee collection of loan payments and rents from properties funded by PML and KPL capital; and

6. review and preserve accounting, escrow, and closing records held by the Title Defendants and other financial intermediaries.

d. An order compelling Defendants and the Title Defendants to preserve and not alter, conceal, or destroy any documents or electronically stored information relating to:

7. PML loans, KPL loans, and collateral properties;

8. closings, disbursements, and lien recording; and

9. communications with PMLs, KPL, and Peoples Bank concerning refinancing, DSCR loans, or "deposit" programs marketed to investors.

e. An order authorizing immediate, expedited discovery limited to identifying and securing enterprise assets, including subpoenas to banks, title companies, and known counterparties.

f. compensatory and treble damages under RICO.

Damages for breach of fiduciary duty and negligence

g. Costs, attorneys' fees, and such other relief as the Court deems just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demands trial by jury on all issues so triable as of right by jury.

Dated:      Huntington, NY
            March 10, 2026

                              **TA LEGAL GROUP PLLC**
                              *Attorneys for Plaintiffs*


            By:    _____
                   Taimur Alamgir, Esq.
                   Matthew Daidola, Esq.
                   205 East Main Street, Suite 3-2
                   Huntington, NY 11743
                   Tel. (914) 552-2669
                   tim@talegalgroup.com