HAYES & SCHANZER LLP
43 West 43rd St., Suite 195
New York, NY 10036-7424
(917) 770-0180 • ahayes@hayesschanzer.com

September 15, 2026

**VIA ECF**

Hon. Joan M. Azrack
United States District Judge
United States District Court, Eastern District of New York
Long Island Federal Courthouse, 100 Federal Plaza
Central Islip, NY 11722

**Re:** *Summitbridge Wealth Management LLC, et al. v. Lighthouse Estates LLC, et al.*, No. 2:26-cv-00141 (JMA) (ST) – Response to Defendant Harris' Letter Seeking Leave to Move to Dismiss

Your Honor:

Defendant Ronald J. Harris Jr.'s proposed motion to dismiss would be futile: dozens of contemporaneous documents elaborate on the allegations in Plaintiffs' Complaint and RICO Case Statement that Harris was the "man behind the curtain" of Van Barker's Ponzi scheme – before *and after* Barker's arrest on Dec. 17, 2025. Before addressing those facts, we respond to Harris' arguments regarding the Court's personal jurisdiction over him.

Harris is subject to this Court's personal jurisdiction under the nationwide RICO service rule, 18 U.S.C. § 1965, *and*, independently, this Court's enforcement power under Fed. R. Civ. P. 65(d)(2)(C), given the discovery that properties continue to be transferred from various Barker LLCs to KYPL Holdings 1, LLC ("Holdings") – as Harris urged Barker's team to do in early 2026 – despite the Feb. 13, 2026 stipulated TRO (ECF No. 38). *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 136–37 (2d Cir. 2014).

The basis for this Court's personal jurisdiction under § 1965 is a well-trod two-step inquiry. As the Second Amended Complaint ("SAC"; ECF No. 101) and the RICO Case Statement (ECF No. 126) allege, the Barker Enterprise's contacts with this District involve multiple communications and solicitations of New York-based plaintiffs by the Transaction Coordinator Defendants, whose served as the point of contact between Barker and the Plaintiffs; as well as the interstate wires directed into this District, all of which suffice to establish jurisdiction under 18 U.S.C. § 1965(a) regarding members of the Enterprise who transacted their affairs here. *See, e.g.*, SAC ¶¶ 13–14, 221, 228–236; *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71–72 (2d Cir. 1998) (§ 1965(a) is satisfied where at least one defendant transacts its affairs in the district; § 1965(b) then reaches co-defendants "residing in any other district" where the ends of justice require). Indeed, Harris does not seem to dispute that this Court has personal jurisdiction over Barker himself, or his myriad LLCs and colleagues.

Thus Harris' jurisdictional challenge reduces to the claim that the "ends of justice" do not support this Court's assertion over him. Focusing solely on his immediate business associates, Harris argues that only Kentucky will do – which turns the "ends of justice" inquiry on its head, as that logic would prevent him from being sued in any state other than Kentucky for his role in Barker's RICO scheme. Here, however, Barker's Transaction Coordinators were in contact with scores of lenders who across the continental United States: there are over a dozen Barker victims in each of California, Texas, Florida, and New York. No other district has jurisdiction over all the Enterprise's members, who are spread across Kentucky, Indiana, Ohio, Michigan, Florida, California, Texas and Wyoming. *See PT United Can*, 138 F.3d at 71–72; *see Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986). By contrast, the cases Harris cites involved foreign defendants, whom § 1965(b) does not reach, while Harris himself resides in Kentucky. *See Fire & Police Pension Ass'n v. Bank of Montreal*, 368 F. Supp. 3d 681 (S.D.N.Y. 2019); *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015).

It also bears emphasis that New York State's long-arm statute reaches an out-of-state conspirator through his co-conspirators' acts directed into the forum where, as here, the complaint alleges (a) a conspiracy, (b) the defendant's participation in it, and (c) overt acts by co-conspirators in furtherance of it. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86–87 (2d Cir. 2018); N.Y. C.P.L.R. 302(a)(2); SAC ¶¶ 8, 13, 174, 212–218, 221, 224, 228–236. (Harris' letter simply overlooks New York State law on this issue.) Thus even if Harris has a colorable argument regarding the sufficiency of the RICO claim against him, New York courts may still exercise co-conspirator jurisdiction over him, given his management of Bear Capital, Bear's receipt of payments from Lighthouse closings,[1] and his direction to Barker's team in early 2026 to transfer cash-flowing properties from Barker's LLCs to Holdings.

Harris' arguments regarding the substance of the RICO claims alleged against him also fail. Here are the most salient instances of his personal involvement in Barker's RICO scheme, which suffice to state a claim against him for, at least, violation of § 1962(d):

- After encouraging Barker to use straw buyers to evade federal and state laws and rules on lending limits, Harris "lied to other community banks on [Barker's] behalf" about those loans.[2]
- In July 2025, Harris formed and managed Defendant Bear Capital, LLC ("Bear") to facilitate Barker's property-flipping. Bear included cash from Barker and his family, and other cash transfers whose sources are not clear. However Bear's bank statements show that 75% of its monthly *distributions* of cash which totaled $240,000) were wired to KPL's three managers (i.e., $60,000 x 3), while 25% (*i.e.*, $60,000) were wired to Ballard Properties LLC, a single-

[1] *See* RICO Case Statement, Response No. 2(e)(37), at 15–16 (Harris formed Bear Capital on July 16, 2025; beginning in October 2025 Bear received approximately $5,000 from at least sixteen Plaintiff-funded closings; each of which was unauthorized); Resp. no. 2(e)(40), at 16–17 (Harris drove the Bank's decision to approve Bear Capital's line of credit), 19–20 (cites § 1965(b), noting multiple direct solicitations of New York plaintiffs by the Transaction Coordinator Defendants); Resp. no. 5(b)-(c)(xvii) at 26; Resp. no. 14(b)(iii)-(vi), at 38.

[2] Van Barker's Signal messages to one of the Transaction Coordinator Defendants, Maria Bock, include the following, on Aug. 14, 2025: "We just need faces / Names / Entities / That Ronnie can highlight as borrower diversity on the rolls / He absolutely knows what's up and even lied to other community banks on our behalf saying we were only 30% of KPL's books". *See also* SAC ¶¶ 4, 159, 206.

member LLC managed by Harris himself – strongly suggesting that Harris had invested his or his family's funds in Bear Capital, to support Barker's scheme.[3]

- On Aug. 6, 2025, Harris led a "four hour meeting with [Peoples Bank] and KPL today on growth and strategy" – after which Barker spread the word on moving his banking to Peoples, and on the need to use multiple LLCs as property purchasers, to disguise the extent to which KPL's loans were all going to Barker's fix-and-flip business.[4]
- Barker's Signal messages document his gleeful outreach to staff, friends, and family, asking them, and people they could recruit, to act as straw buyers and borrowers on Barker's behalf – or, as he put it, to "be a Bernie" (a reference to the film "Weekend at Bernie's"), to disguise how much of KPL's loans were going to Barker's properties.[5] Barker even sought straw buyers to buy properties *from* KPL's portfolio, to increase KPL's ability to buy Barker's properties.[6]
- On Oct. 30, 2025, Harris organized a day's worth of meetings with Van Barker, his colleagues, his father (Brian Barker) and his father's business partner (who both flew in from California), KPL's leadership, and executives from the bank that Harris indirectly owned.[7]
- Between Dec. 2 and 9, 2025, Harris edited Red Door Legacy, LLC's operating agreement to appoint Defendant Eric Payne (a KPL member/manager) as Red Door's sole Manager, authorized to transfer Barker's properties to a new KPL affiliate – Holdings – that amended agreement was signed on Dec. 9, 2025 and celebrated on Dec. 10, 2025 by Barker and KPL's Metten as a "merger" of their companies.[8]

---

[3] SAC ¶¶ 171, 174, 213, 216; Case Statement Resp. No. 2(e)(37), at 15–16; Bear Capital's Peoples Bank statements (produced to the Receiver) show $15,000 monthly transfers "per A Metten" to each of LTS Consulting, Payne Capital, and Bryan Etscorn (*i.e.*, KPL's three managers), and Ballard Properties LLC.

[4] Van Barker to Brad Foreman, Aug. 6, 2025, 9:58–9:59 PM ("This is our bank now"); to Joshua Kennedy, Aug. 13, 2025, 6:16 PM (further bank allotments "with Ronnie's approval"; "Ronnie is going to take a more personal ownership stake in all of this").

[5] Van Barker to Maria Bock, Aug. 14, 2025, 3:20–3:21 PM ("Maria, I'm calling in your husband and any other family names you can drum up / I need 10 people to refinance our KPL houses into their names as borrowers, $5000 per"); to Mo Ndiaye, July 26, 2025, 6:15–6:19 PM ("And we insert our own borrowers onto the books"; "Rianne is doing this too / And my Dad / Etc / Basically we are going to pack the books"); to Josh Hernandez, Dec. 14, 2025, 7:52–8:12 PM ("How do you feel about being a Bernie"; "use you as our 'Bernie' to go get more refinance money outside of our system with KPL").

[6] Van Barker to Joshua Kennedy, June 26, 2025, 8:38–8:39 PM (after a call with KPL that morning: "We are also going to just start buying other KPL clients' shit / Anything and everything / Flow that money back to them fast"; "Because we can engineer that / So we can all kind of be in on it / A closed loop"); to Mo Ndiaye, July 14, 2025, 3:43 PM ("I talked with KPL, you are now the officially unofficially approved third-party actor to try and get these off their books / No link to KPL or us"), and July 26, 2025, 6:14–6:15 PM ("I can sell you houses from KPL clients at a 40% discount / You take out loans from KPL as a borrower in your own right, and purchase them"; "we are 50% of KPL's $30 million book / For good common sense reasons, we can't technically be higher than 50% as a single entity / So how do we grow our borrowing power? We indirectly take over the other half").

[7] Brad Foreman to Van Barker, Oct. 30, 5:58 and 6:28 PM; Brian Barker's Nov. 2 draft email, ("Thanks so much for hosting us on Thursday").

[8] SAC ¶¶ 170, 173, 217–218; Van Barker, Starpoint "Admin Small Group," Dec. 2, 2025, 9:35–9:58 AM (operating agreement sent to Harris and Metten in editable form, in Word); Red Door Legacy LLC Amended Operating Agreement dated Dec. 9, 2025.

- In late December and early January 2026, after Van Barker's arrest, Harris personally led several enterprise-wide Zoom conferences among Barker's managers, staff, and Transaction Coordinators – together with KPL's Metten – developing a plan for the Plaintiffs to write off about half of *their* loans, while Harris, KPL, and Holdings secured the valuable portions of Barker's portfolio (much of it bought with Plaintiffs' cash) for themselves.[9]

These facts – obtained before Harris or KPL have produced their own documents regarding these events – show that Harris was an essential part of the growth and perpetuation of Barker's scheme and make his proposed motion to dismiss a poor use of the Court's resources.[10]

In short, Harris did not start Barker's Ponzi scheme, but he eagerly invested his time and capital to help it grow – even after Barker sent his delusional "Takedown Play" email to Metten and Payne on July 22, 2025 (ECF No. 126), and even after Barker's arrest. That is enough. A RICO conspirator need not have originated the scheme or committed a predicate act; it suffices that he "knew about and agreed to facilitate the scheme," *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003); *Salinas v. United States*, 522 U.S. 52, 65 (1997). One who joins a conspiracy in progress is liable for it without knowing all of its members or details, so long as he knows the general nature of the enterprise and that it extends beyond his own role. *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989); *United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008); *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000).

Respectfully,

**HAYES & SCHANZER LLP**

By: *Andrew W. Hayes*
Andrew W. Hayes, Esq.
43 West 43rd St., Suite 195
New York, NY 10036-7424
(917) 770-0180
ahayes@hayesschanzer.com
*Attorneys for Plaintiffs*

cc: All counsel of record (via ECF)

---

9 Siyuan Zheng, Lighthouse "Interim Board" group, Dec. 30, 2025, 12:50 PM (during the noon call with Metten and his "business partners": "We need a new LLC move all healthy cash flow DSCR refinanced houses off Red Door / I think that's Ronnie means"), and Jan. 2, 2026, 4:26 PM ("Ronnie is saying that KYPL holdings should take the cash flowing houses"). Plaintiffs have been advised that Harris participated in Zoom or Teams calls on Dec. 29, 2025 and Jan. 2, 4, 5, 6 and 7, 2026.

10 Van Barker to Brad Foreman, Aug. 6, 2025, 9:58–9:59 PM ("This is our bank now"); to Joshua Kennedy, Aug. 13, 2025, 6:16 PM (further bank allotments "with Ronnie's approval"; "Ronnie is going to take a more personal ownership stake in all of this"); to Maria Bock, Aug. 14, 2025, 5:06 PM (n.2 *supra*); to Shaneh Halliwill, Aug. 26, 2025, 2:08–2:09 AM ("We dominate KPL's books / We need to make it look super nice and clean so that, even though it is not an active concern, there is never cause for their banking partners to declare we are too large of a concentration / People's Bank won't do it because now their owner co-owns our finished rentals"); to Eric Payne, Oct. 3, 2025, 4:38 PM (entity diversification "will prove useful for third party audits and bank calls so that Ronnie doesn't have to fib").